# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| HP Laptop computer model 15-n210dx, serial number | ) |
| 5CD40404MY, currently in the possession of DCI's forensic | ) Case No. ___18·M·1213___ |
| office in Madison, Wisconsin, more particularly described in | ) |
| Attachment A. | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

HP Laptop computer model 15-n210dx, serial number 5CD40404M,currently in the possession of DCI's forensic office in Madison, Wisconsin, more particularly described in Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jay Novak, DEA Task Force Officer
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: __1/12/18__

_____
*Judge's signature*

City and State: __Milwaukee, Wisconsin__          __Honorable William E. Duffin__, U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Jay Novak, being duly sworn, depose and state as follows:

## INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—an electronic device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation, (DCI) since 1992. I am also a federally deputized task force officer for the United States Department of Justice, Drug Enforcement Administration ("DEA"). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

3.      I have participated in numerous complex narcotics investigations, which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. More specifically, my training and experience includes the following:

   a.      I have utilized informants to investigate drug trafficking. Through informant interviews, and extensive debriefings of individuals involved in drug trafficking, I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin and throughout the United States;

b.    I have also relied upon informants to obtain controlled substances from dealers, and have made undercover purchases of controlled substances;

c.    I have extensive experience conducting street surveillance of individuals engaged in drug trafficking. I have participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, and drug trafficking records were seized;

d.    I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, cocaine base (unless otherwise noted, all references to crack cocaine in this affidavit is cocaine base in the form of crack cocaine), ecstasy, and methamphetamine. I am familiar with the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

e.    I am familiar with the language utilized over the telephone to discuss drug trafficking, and know that the language is often limited, guarded, and coded;

f.    I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g.    I have been assigned to court-authorized wiretaps and have been trained to operate the equipment utilized to conduct such operations;

h.    I know that drug traffickers often put their telephones in nominee names in order to distance themselves from telephones that are utilized to facilitate drug trafficking; and

i.    I know that drug traffickers often use drug proceeds to purchase assets such as vehicles, property, and jewelry. I also know that drug traffickers often use nominees to purchase and/or title these assets in order to avoid scrutiny from law enforcement officials.

j.    I know that drug traffickers often use electronic equipment such as computers, telephones (land-lines, cell phones, and smart phones), telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information pertaining to their trafficking activity and the proceeds of that activity.

4.    I am currently participating in an investigation of a large-scale heroin and cocaine drug trafficking organization (DTO) led by Clifton L. MORRISON herein referred to as the MORRISON DTO. I am familiar with the facts and circumstances regarding this investigation as

2

a result of my personal participation in this investigation, and my review of: (a) consensually recorded telephone conversations and face-to-face meetings; (b) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; (c) court-authorized interception of wire and electronic communications; and (d) information obtained from cooperating citizen witnesses, confidential sources, and defendants, whose reliability is established herein.

5.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.    The property to be searched is an HP laptop computer, model 15-n210dx, serial number 5CD40404MY, hereinafter the "Device." The Device is currently located at DCI's forensic office in Madison, Wisconsin.

7.    The applied-for warrant would authorize the forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.    In March 2013, the Drug Enforcement Administration initiated an investigation into the drug trafficking activities of Clifton MORRISON and additional individuals. Collectively, these individuals were members of the MORRISON DTO, which distributed heroin and cocaine in and around the metropolitan area of Milwaukee, Wisconsin before 2013. The organization acquired heroin and cocaine from multiple sources, some of whom were located in the greater Chicago, Illinois, area. The source(s) delivered the heroin and cocaine to members of the organization at locations in southeastern Wisconsin. The organization then transported the narcotics to Milwaukee, Wisconsin. The substances were prepared for distribution by DTO

3

members, usually at a stash location, and subsequently provided to mid-level distributors for sale. This investigation utilized numerous investigative techniques including but not limited to the following: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; controlled buys of drugs, controlled meetings with targets, recorded telephone calls with targets, and physical surveillance. Ultimately, a court authorized the monitoring of several cellular telephones used by DTO members.

9.      As part of the investigation, the Honorable J.P. Stadtmueller, the Honorable Pamela Pepper, and the Honorable Lynn Adelman, United States District Court Judges for the Eastern District of Wisconsin, issued Orders authorizing the interception of communications to and from cellular telephones used by David WILDER, Clifton MORRISON, Miguel RODRIGUEZ, and Jose RODRIGUEZ.

10.      In part, the court authorized monitoring revealed that Clifton MORRISON obtained heroin and cocaine from Jose RODRIGUEZ. MORRISON, or a DTO member, met directly with either Jose RODRIGUEZ or Miguel RODRIGUEZ to obtain the narcotics and/or to provide the RODRIGUEZ' with drug-related proceeds. A source of supply for Jose RODRIGUEZ was Brenda VALVERDE, who served as a courier for an unknown male supplier that may reside in Mexico. Jose RODRIGUEZ provided money to Brenda VALVERDE for the unknown male supplier and VALVERDE then supplied Jose RODRIGUEZ with narcotics. Jose RODRIGUEZ subsequently distributed the narcotics to other individuals, including Clifton MORRISON.

11.      Between July 11, 2017 and December 5, 2017, numerous calls and text messages between VALVERDE and Jose RODRIGUEZ were intercepted. All the conversations and text messages took place in Spanish and were translated by a trained Spanish-speaking linguist.

4

12.   For example, on July 11, 2017, Jose RODRIGUEZ exchanged a series of text messages with Brenda VALVERDE at (847) 344-1111.   VALVERDE sent two text messages to Jose RODRIGUEZ that read, "The man told me to ask if you could give me two bucks I need to leave to Mx," and "in an emergency."   Jose RODRIGUEZ sent VALVERDE a text message that read, "I don't have them, until the weekend!!"   VALVERDE subsequently sent two text messages to Jose RODRIGUEZ that read, "By Thursday," and "I leave on Friday."

13.   Based upon their training, experience, and familiarity with the investigation, case agents believe VALVERDE indicated she spoke with the source of narcotics and asked if Jose RODRIGUEZ could give VALVERDE an amount of drug-related proceeds because VALVERDE needed to leave for Mexico ("The man told me to ask if you could give me two bucks I need to leave to Mx.").   Jose RODRIGUEZ advised that he did not yet have the drug-related proceeds. VALVERDE informed Jose RODRIGUEZ that she needed the drug-related proceeds by Thursday because she was leaving on Friday.

14.   On July 28, 2017, Jose RODRIGUEZ received a call from VALVERDE using (847) 344-1111.   VALVERDE stated, "Uh, the man got ahold of me yesterday and asked me if everything is okay."   Jose RODRIGUEZ replied, "Well yeah.   I'm not going to do anything because I'm leaving for Puerto Rico for ten days.   I'm flying out this afternoon.   I'm going to be ten days... I have a situation over there, and I'm going for a little while.   We'll be in touch when I get back... Yeah, everything is fine so we'll be in touch once I get back, okay?"   VALVERDE said, "Of course, sir.   Have a good trip.

15.   Case agents believe VALVERDE advised that she spoke with the source of supply and asked if Jose RODRIGUEZ needed any additional narcotics ("the man got ahold of me yesterday and asked me if everything is okay").   Jose RODRIGUEZ indicated that he was leaving

5

for Puerto Rico in ten days and would not need any additional narcotics until he returned ("I'm not going to do anything because I'm leaving for Puerto Rico for 10 days."); ("Yeah, everything is fine so we'll be in touch once I get back.").

16.    A series of text messages on that same date between Jose RODRIGUEZ and VALVERDE, using (847) 344-1111, then transpired.  Jose RODRIGUEZ received a text message from VALVERDE.  This text message read, "Hello sir, you think you can give me a buck please." VALVERDE sent another text message to Jose RODRIGUEZ that read, "Before you leave." VALVERDE sent another text message to Jose RODRIGUEZ that read, "Over by your brother." Jose RODRIGUEZ sent a text message that read, "I can't for now. I'm very tight." VALVERDE sent a text message to Jose RODRIGUEZ that read, "You can't give me anything." Jose RODRIGUEZ sent VALVERDE a text message that read, "I barely have enough for my trip."

17.    Case agents believe VALVERDE sent a text message to Jose RODRIGUEZ asking for at least a small quantity of money, possibly $1,000 ("Hello sir, you think you can give me a buck please." Jose RODRIGUEZ advised VALVERDE that he was unable to provide any money to VALVERDE ("I can't for now, I'm very tight." / "I barely have enough for my trip.").

18.    On August 18, 2017, VALVERDE, using (847) 344-1111, called Jose RODRIGUEZ.  VALVERDE advised, "The man called me yesterday and told me that, that if you can give 2,000 to 3,000 dollars, because I have to send that to him.  I don't know how you do this, he just told me that you owe him a good amount and that he needed you to help him out with that right now.  That he needed that money now."  Jose RODRIGUEZ explained that he was "in a bad spot" and that he was unable to provide VALVERDE with the required drug-related proceeds because his customers were "behind" in paying him.  Jose RODRIGUEZ continued, "Well Brenda, let me see I will look for something else in the next few days.  Because I'm looking to see if I can

6

get a better price so that I can recover." VALVERDE asked, "But didn't you and him already agree on a price, for him to lower it by one buck? Something like that, maybe two bucks?" Jose RODRIGUEZ acknowledged they had that discussion several months ago and the price of the narcotics had decreased from that time. VALVERDE advised she would talk to "him" and asked how much Jose RODRIGUEZ wanted the cost lowered by. Jose RODRIGUEZ advised he wanted it for "one dollar" less because he "got some from another place for that same number." VALVERDE stated, "In case that we could get the price that you want, how many would you like to get?" Jose RODRIGUEZ replied, "Well, bring me three, you know? Three at least, because that what I have now and those three can take about ten days to two weeks because right now they are fucking slow, you know. And I can't give them more, because we'll get further behind. This is the business, you know how the business is. We've been years doing the same thing." VALVERDE said she could call "him."

19.     Case agents believe Jose RODRIGUEZ advised VALVERDE that he was able to obtain narcotics from a different supplier for cheaper than VALVERDE's supplier and encouraged VALVERDE to reach out to her contact to see if he could match that price. If VALVERDE's supplier was willing to match the price, Jose RODRIGUEZ requested to obtain an additional quantity of narcotics (possibly three kilograms).

20.     On that same date, Jose RODRIGUEZ received a call from VALVERDE using (847) 344-1111. VALVERDE said, "I just spoke with him. He said he was going to call down there…to see if they would authorize for him to lower that for you. He is going to try to get them for today. I mean tomorrow at the least when we'll see you." Jose RODRIGUEZ said, "Okay, that's good." VALVERDE continued, "I'm going to get you three and we're going to try to get you a few more in case you need them for next week. Does that work for you?" Jose

RODRIGUEZ replied, "Okay then, what you can do is get me five if it's going to be like that, okay? To not waste trips." VALVERDE said, "That seems good to me." Jose RODRIGUEZ said, "And that way it saves you trips. You can do it all together and I can get you a couple of bucks by the weekend. Okay?" VALVERDE responded, "Oh, okay, that's fine." Jose RODRIGUEZ stated, "Okay, that would be better, because like that I can leave the other side, because I'm waiting to get something and I'll be able to stop them and continue with you. Because the man has helped me a lot in the past." VALVERDE said, "[U/I] tomorrow [U/I] okay." Jose RODRIGUEZ replied, "No problem, but make sure it's good. Okay, mama." VALVERDE replied, "Of course."

21.     Case agents believe VALVERDE called Jose RODRIGUEZ to let Jose RODRIGUEZ know she recently spoke with the narcotics source of supply ("the man") and that the source was going to call the Mexican supplier to negotiate a lower price for Jose RODRIGUEZ to purchase narcotics ("I just spoke with him. He said he was going to call down there…to see if they would authorize for him ('the man') to lower that for you."). VALVERDE further stated "the man" was going to attempt to provide Jose RODRIGUEZ an undetermined amount of narcotics today or the following day at the latest ("He is going to try to get them for today. I mean tomorrow at the latest when we'll see you."). VALVERDE further stated that they were going to try to provide Jose RODRIGUEZ three ("I'm going to get you three."). Case agents believe "three" is a reference to three kilograms of an unknown narcotic, likely either cocaine or heroin. VALVERDE also informed Jose RODRIGUEZ that, in addition to the "three" she was trying to procure for Jose RODRIGUEZ, VALVERDE would to try and obtain more than just the "three" in the event Jose RODRIGUEZ needed them in the upcoming week ("…and we're going to try to get you a few more in case you need them for next week"). Case agents believe this was a specific reference to

providing Jose RODRIGUEZ narcotics so Jose RODRIGUEZ, in turn, would be able to supply narcotics to his customers in the upcoming week. Jose RODRIGUEZ acknowledged VALVERDE's offer, and stated he could specifically use "five" of the unknown narcotics. In addition, by providing "five" VALVERDE would be able to provide Jose RODRIGUEZ the narcotics he believed necessary without having to meet on multiple occassions ("Okay the, what you can do is get me five if it's going to be like that okay. To not waste trips."). Case agents believe Jose RODRIGUEZ told VALVERDE of his intention to continue to obtain narcotics through VALVERDE and "the man" as opposed to a different narcotics source. Case agents believe Jose RODRIGUEZ was comfortable with VALVERDE and "the man" because they had extended him courtesy and helped him in the past ("Okay, that would be better, because like that I can leave the other side, because I'm waiting to get something and I'll be able to stop them and continue with you. Because the man has helped me a lot in the past.").

22. As another example, on November 13, 2017, VALVERDE, using (847) 344-1111, called Jose RODRIGUEZ. VALVERDE said, "Yes, we have some good news. How many would you like? Would you like to grab four?" Jose RODRIGUEZ asked, "For when?" VALVERDE replied, "For today or tomorrow, I think... But it's at three zero (3-0), is that okay?" Jose RODRIGUEZ asked, "Pardon?" VALVERDE repeated, "They're at three zero (3-0)." Jose RODRIGUEZ acknowledged, "Oh, three zero (3-0)? Oh fuck... Could it be done with 500 less? Could it be done or not?" VALVERDE replied, "Let me ask them. You want it 500 lower?" Jose RODRIGUEZ said, "Yes, please, lower it 500. With 500 less I can be more competitive, because it's a bit expensive, but it will be fine with 500 more, okay? 500 less and I'll grab four." VALVERDE asked, "And I was going to ask you, how long do you think it would take you? Can

you do it this week?" Jose RODRIGUEZ responded, "Just to be sure, I will say about ten days." VALVERDE advised, "Oh okay, that's fine, let me call the mister. I'll get back to you shortly."

23.   Case agents are aware that a kilogram of cocaine is approximately $30,000. Therefore, based on their training, experience, and familiarity with this investigation, case agents believe VALVERDE offered to sell four kilograms of cocaine ("Would you like to grab four?") to Jose RODRIGUEZ for $30,000 a piece ("They're at three zero (3-0)."). Jose RODRIGUEZ asked if VALVERDE would be willing to sell the kilograms for $29,500 ("Could it be done with 500 less?"), and further advised he would be able to pay her for the cocaine in approximately ten days ("I will say about ten days."). VALVERDE advised she would call the source of supply with this request and call Jose RODRIGUEZ back ("...let me call the mister. I'll get back to you shortly.").

24.   On that same date, VALVERDE called Jose RODRIGUEZ and Jose RODRIGUEZ asked, "Is there still good news or no?" VALVERDE replied, "...he called me and was not able to answer the phone but I think he will call me later. I think the trip will happen tomorrow...during the course of the afternoon when I get off work." VALVERDE then advised, "Listen, tomorrow I am going to call from another number, okay?" Jose RODRIGUEZ acknowledged.

25.   On November 14, 2017, Jose RODRIGUEZ called VALVERDE at (847) 344-1111. Jose RODRIGUEZ asked, "What happened? Anything? Have they called you yet?" VALVERDE replied, "No, I'm waiting for the call from those people. Wait for them to call me. They now have my number. I'm just waiting for them to reach me. They will maybe call me from down there." Jose RODRIGUEZ asked, "Do you think they will call you? They keep saying, 'Tomorrow, tomorrow,' and nothing... You think maybe tomorrow?" VALVERDE responded, "Yes, God willing." Jose RODRIGUEZ acknowledged.

26. Case agents believe Jose RODRIGUEZ inquired whether VALVERDE was able to obtain the cocaine to provide to Jose RODRIGUEZ. VALVERDE indicated she was waiting to hear from the source of supply and that this source may call her from Mexico ("No, I'm waiting for the call from those people... They will maybe call me from down there."). VALVERDE advised she hoped she would hear from the source the following day.

27. On November 15, 2017, MORRISON called Jose RODRIGUEZ and MORRISON asked, "Just checking with you to see if you heard anything about the title." Jose RODRIGUEZ replied, "I'm supposed to... I'm waiting today, buddy, that's why I haven't called you yet. I'm just waiting to hear, it should be today. You know what I mean? I've been waiting since yesterday so I'm waiting for the call... It's kind of tough right now, but I think today might be the day. Okay, buddy?" Based upon their training, experience, and familiarity with the investigation, case agents believe "title" is coded language MORRISON used to refer to narcotics.

28. Case agents believe MORRISON inquired whether Jose RODRIGUEZ had obtained narcotics to provide to MORRISON ("Just checking with you to see if you heard anything about the title."). Jose RODRIGUEZ advised he has been waiting to hear from the source of supply since the day before and was hoping to hear from them that day, and would contact with MORRISON ("I'm just waiting to hear, it should be today."). Based on the aforementioned intercepted communications between Jose RODRIGUEZ and VALVERDE, case agents further believe Jose RODRIGUEZ was waiting to obtain narcotics from VALVERDE so that he could provide it to MORRISON.

29. On December 5, 2017, VALVERDE, using (847) 344-1111, called Jose RODRIGUEZ. During the call, VALVERDE stated "...he hasn't been able to give me anything, I think he is struggling a bit but he said that he was looking at other people and if they could give to

11

you" and "...he called me yesterday and I think he arranging that now." VALVERDE further stated "They were going to give me a gray truck but I think he...someone else said "No" because it was not good, so then why even move it." Jose RODRIGUEZ replied "Yeah. No, no. I don't want gray, um, ...(U/I) I do want some but, no, of the other one. When you are ready call me because it is (U/I) we are waiting. We are desperate." Jose RODRIGUEZ then stated "...they say one day and then they say the other. I don't know, so much change." VALVERDE replied "oh no, I know." Jose RODRIGUEZ then asked "When do you think?" VALVERDE replied "I think he will let me know later today" and "he called me just now but I was unable to answer his call but, I already sent him a message for him to call me." VALVERDE subsequently asked "He also told me that if you could, if you could help me with one peso, do you think you can?" Jose RODRIGUEZ stated he couldn't." VALVERDE then stated "Okay, we'll...we'll wait later and see when he calls me." Jose RODRIGUEZ told VALVERDE "Okay, (U/I) please call me. Give me good news."

30.     Case agents believe VALVERDE told Rodriguez that her source of supply was unable to supply her with a quantity of narcotics at that time and the source was checking with other sources of supply to see if they could supply the narcotics to her which she would then supply to Jose RODRIGUEZ, ("...he hasn't been able to give me anything, I think he is struggling a bit but he said that he was looking at other people and if they could give to you" and "...he called me yesterday and I think he arranging that now."). VALVERDE also stated that the source had a kilogram of heroin but it wasn't of good quality so it was not worth supplying to Jose RODRIGUEZ, ("They were going to give me a gray truck but I think he...someone else said "No" because it was not good, so then why even move it."). Case agents know that Jose RODRIGUEZ has used the term "gray" and "truck" in other intercepted calls with individuals involved in the conspiracy as code language for heroin and a kilogram of heroin. Jose RODRIGUEZ told

VALVERDE he did not want the heroin but wanted cocaine and wanted to obtain it right away, (Yeah. No, no. I don't want gray, um, ...(U/I) I do want some but, no, of the other one. When you are ready call me because it is (U/I) we are waiting. We are desperate."). VALVERDE stated that she was expecting a return call from her source and that the source was also inquiring if Jose Rodriguez could make a payment up front for the narcotics (He also told me that if you could, if you could help me with one peso, do you think you can?). Jose RODRIGUEZ stated he could not pay VALVERDE any money at that time. VALVERDE advised Jose RODRIGUEZ that she would find out when she talked to her source and Jose RODRIGUEZ stated he hoped the source would tell VALVERDE that the source had narcotics available for VALVERDE to supply to Jose RODRIGUEZ, ("Okay, we'll...we'll wait later and see when he calls me" and "Okay, (U/I) please call me. Give me good news.")

31.     Law enforcement determined Brenda VALVERDE was using telephone number (847) 344-1111 based on court-authorized interceptions of electronic communications, physical surveillance, and law enforcement database records.   More specifically, while conducting surveillance case agents observed VALVERDE driving a vehicle that, according to Illinois Department of Transportation records, lists to Brenda VALVERDE.  In addition, case agents have reviewed a State of Illinois booking photograph for Brenda VALVERDE, and this photograph matches the person whom they observed on surveillance.

32.     On December 5, 2017, an arrest warrant was signed for Brenda VALVERDE in the U.S. District Court, Eastern District of Wisconsin based upon a criminal complaint charging VALVERDE, Jose RODRIGUEZ and others with Conspiracy to Distribute and Distribution of Cocaine and Heroin.

33.     On December 6, 2017 law enforcement arrested VALVERDE on the arrest warrant at her residence, XX46 S. Clarence Ave., Berwyn Illinois. VALVERDE gave consent to search the residence, and seized during a search of VALVERDE and her residence were multiple cellular telephones, including an Apple iPhone with telephone number (847) 344-1111 for which VALVERDE provided the passcode. Also seized was a credit card billing statement in the name BRENDA VALVERDE which showed VALVERDE having charges in Laredo Texas in July 2017 and charges in Mexico in the following days. A Mexico passport was also located that showed stamped travel into the country of Mexico in May and August 2017.

34.     An HP laptop computer, model 15-n210dx, serial number 5CD40404MY was also seized and is therefore in the lawful possession of Wisconsin Department of Justice, DCI.

35.     The Device is currently in storage at DCI's forensic office in Madison, Wisconsin. In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the Wisconsin Department of Justice, DCI.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

37.     There is probable cause to believe that things that were once stored on the Device may still be stored there, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been

14

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

       b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

       c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

       d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

38.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

e.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

f.    Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

g.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

h.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

16

i. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

41. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

## ATTACHMENT A

The property to be searched is an HP laptop computer, model 15-n210dx, serial number 5CD40404MY, hereinafter the "Device." The Device is currently located at DCI's forensic office in Madison, Wisconsin.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**

1.      All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(1) and 846 and involve Brenda VALVERDE since January 2013, including:

a.      lists of customers and related identifying information;

b.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

c.      any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

d.      any information recording Brenda VALVERDE's schedule or travel from January 2013 to the present;

e.      all bank records, checks, credit card bills, account information, and other financial records.

f.      evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

g.      evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

h.      passwords, encryption keys, and other access devices that may be necessary to access the computer;

i.      records of Internet Protocol addresses used;

2

j.   records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.